**Richard BLANCHARD, Plaintiff, Appellant,**

v.

**PEERLESS INSURANCE COMPANY, Defendant, Appellee.**

No. 91–1421.

United States Court of Appeals, First Circuit.

Heard Sept. 11, 1991.

Decided March 5, 1992.

484

Gary Yesser with whom Yesser, Jessup & Green, Providence, R.I., was on brief, for plaintiff, appellant.

Raymond A. LaFazia with whom Gunning, LaFazia & Gnys, Inc., Providence, R.I., was on brief, for defendant, appellee.

Before TORRUELLA, Circuit Judge, TIMBERS, Senior Circuit Judge,[*] and CYR, Circuit Judge.

CYR, Circuit Judge.

Plaintiff Richard Blanchard appeals from a summary judgment dismissing his third-party beneficiary claim under a homeowners policy issued to James and Ann Brown by defendant Peerless Insurance Company ("Peerless"). The district court determined, as a matter of law, that the homeowners' son, Paul Brown, was not a "covered person" within the meaning of the Peerless policy, because he was not a "resident" of the Brown family household at the time of the shooting incident which is the subject of the third-party beneficiary claim. We must scrutinize Rhode Island law for the substantive criteria controlling our *de novo* determination whether the record before the district court precluded reasonable disagreement as to the meaning of the insurance policy provision relating to "residency" and foreclosed any trialworthy "residency" issue. We conclude that summary judgment was not warranted.

# I

## BACKGROUND [1]

In November 1986, following a disagreement with his parents, nineteen-year-old Paul Brown left the Brown family home, where he had resided continuously for eleven years, and moved into a room rented from a friend. Over the next ten months, which his mother characterized as a "phase in-phase out period," Paul worked intermittently as a part-time plastering "subcontractor" and consistently maintained regular contacts with the family home. According to his mother, he continued to keep "a lot of" clothing and other personal belongings (*e.g.*, skis, guns) in the family home bedroom he had occupied for years. He used the Brown family home address on his driver's license, car registration and tax returns, received some mail (*e.g.*, bank statements) at the family home address, and retained a key to the family home. Paul visited his parents at least twice a week to help with household chores and for family meals, and remained overnight on Christmas Eve 1986.

During a visit to the family home in August 1987, Paul Brown shot plaintiff Richard Blanchard with a pellet gun he had retrieved from his bedroom in the family home. Three weeks after the shooting incident, Paul moved from the rented room into an apartment he thereafter shared intermittently with his girlfriend. Sometime later he opened a new bank account, once again using the family home address.

Following an unsuccessful state court tort action against Paul's parents, and after obtaining an uncollectible default judgment against Paul, Richard Blanchard brought the present action under the Peerless homeowners policy, which defines the term "insured" as including any family member who is a "resident" of the insured premises. Peerless moved for summary judgment on the ground that Paul was not a "resident" of the Brown household at the time of the shooting incident in August

[*] Of the Second Circuit, sitting by designation.

1. The material facts are related in the light most favorable to plaintiff Blanchard, the party opposing summary judgment. *See Price v. General Motors Corp.*, 931 F.2d 162, 164 (1st Cir.1991).

1987. The motion for summary judgment was submitted on the deposition testimony given by Paul and his parents in the earlier state court proceedings. Paul's deposition testimony categorically disavowed any intention to live with his parents after November 1986. In granting summary judgment for Peerless, the district court stated:

> [R]esidence is sometimes an elusive concept. It has two components. One is physical presence and the other is intent which certainly involves a state of mind.... This case arises in a somewhat unusual posture because normally the two are in conflict ... and the party in question is claiming an intent that is contrary to what the facts suggest. Here though, *both factors point in the same direction.* Paul Brown contends that it was his intent to have permanently left his parents' home ten months before this incident occurred.... [T]he objective facts seem to *overwhelmingly support* that contention. *We would be in a different situation I think if there were any objective facts indicating otherwise but there simply are none....* So it seems to the court that although in many cases state of mind is a factual question that can't be resolved on a motion for summary judgment, in the unique circumstances of this case, that is not so and *there is not enough evidence that would create an issue of fact to be determined by the jury.* (emphasis added).

## II

## DISCUSSION

Appellant Blanchard contends that summary judgment was inappropriate because two jury issues material to the "residency" determination remained in genuine dispute. First, since subjective intent may be relevant to the "residency" determination under Rhode Island law, Blanchard argues that it was for the jury, not the court, to determine the credibility of Paul's testimony that he had no intention to return and reside in the Brown household. *See, e.g., Maiorana v. MacDonald,* 596 F.2d 1072, 1076–77 (1st Cir.1979) (summary judgment generally inappropriate where "state of mind" is a material issue). Second, Blanchard argues that the ultimate determination—whether a particular set of undisputed circumstances is sufficient to establish "residency"—represents primarily an issue of fact for the jury, not a question of law for the court. Since there was considerable circumstantial evidence that Paul continuously maintained significant contacts with the Brown family household between November 1986 and August 1987, Blanchard argues that the jury should have been permitted to determine what reasonable inferences were to be drawn from the objective circumstantial evidence, notwithstanding Paul's disavowal of any intention to resume residence in the family household.

### A. *"Residency" under Rhode Island law*

We review a grant of summary judgment *de novo,* employing the same standards the district court must utilize. *Pedraza v. Shell Oil Co.,* 942 F.2d 48, 50 (1st Cir.1991), *cert. denied,* — U.S. —, 112 S.Ct. 993, 117 L.Ed.2d 154 (1992). Summary judgment is warranted where the record, viewed most favorably to the non-moving party, reveals that there is no *genuine* dispute as to any *material* fact and the moving party is entitled to judgment as a matter of law. *Siegal v. American Honda Motor Co.,* 921 F.2d 15, 17 (1st Cir. 1990). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment...." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) (emphasis in original). Moreover, "the materiality determination rests on ... the substantive law's identification of which facts are critical and which facts are irrelevant...." *Id.* at 248, 106 S.Ct. at 2510.

The parties are in agreement that Rhode Island law controls our interpretation of the operative policy term: "residents of your household." The Rhode Island Supreme Court has described the procedure governing the "residency" determination as follows:

The meaning of the term "residence" or "resident" is a *mixed question of law and fact.* In order to determine if a person is a resident of a particular household, *the court* must consider whether in the *totality of the circumstances* that person maintains a physical presence in the household with intent to remain for more than a mere transitory period, *or* that person has a reasonably recent history of physical presence together with *circumstances* that manifest an intent to return to the residence within a reasonably foreseeable period.

*Aetna Life & Cas. Co. v. Carrera,* 577 A.2d 980, 985 (R.I.1990) (emphasis added). Under *Carrera,* the focus of the relevant "residency" determination is on *the time of the incident* giving rise to the claim asserted under the insurance contract.[2] *Id.* Among the relevant general criteria are: (1) the amount of time spent in the residence; (2) the nature of the living arrangements; (3) the types of activities undertaken in the residence; and (4) the person's intentions regarding the length and nature of the stay. *See id.* at 984 (quoting *Flath-*

*er v. Norberg,* 119 R.I. 276, 377 A.2d 225, 229 (1977)).

Under the *Carrera* decision, as well as *Barricelli v. American Universal Ins. Co.,* 583 A.2d 1270 (R.I.1990), the only extant Rhode Island Supreme Court cases dealing with the insurance contract term "resident of the household," the court has identified, expressly or impliedly, numerous relevant circumstances which may be material to the "residency" determination.[3] Summary judgment is unwarranted if the *existence* of one or more of these, or other, material factors is in *genuine* dispute, unless resolution of the dispute by the factfinder could not affect the ultimate "residency" determination. Therefore, we next consider the nature of the ultimate "residency" determination under Rhode Island law and by whom it is to be made.

In a number of jurisdictions, the "residency" determination is considered a mixed question of law and fact only so long as the material facts remain in *dispute,* but becomes a pure question of law for the court once all that remains to be decided is whether the *competing* circumstantial evidence *not in dispute* is sufficient to permit

2. The *Carrera* rationale for concentrating the evidentiary focus on the *pre*-incident period would appear to be that *post*-incident conduct is more susceptible to conformance with the putative resident's self-interest viewed in the unadulterated light of the incident itself. Thus, summary judgment based on such "self-serving" evidence may entail special risk, especially if the opposing party is denied a meaningful opportunity to cross-examine as to the motive underlying the *post*-incident conduct. Nevertheless, in some jurisdictions, once the factfinder has had an opportunity to evaluate the putative resident's asserted rationale for the *post*-incident conduct, particular *post*-incident conduct may be admitted on the issue of "residency." *See, e.g., Hawaiian Ins. & Guaranty Co. v. Federated American Ins. Co.,* 13 Wash.App. 7, 534 P.2d 48, 56 (1975) (reconciliation of married couple admissible as evidence from which *factfinder* could conclude that absentee wife had intended to retain "residence" with husband during earlier separation).

3. The circumstances in the *Carrera* and *Barricelli* cases suggest that at least the following factors are appropriate for consideration: (1) the duration of the person's current physical presence in, or absence from, the parental home, (2) the person's age and legal status (*e.g.,* minor, eman-

cipated minor, adult), (3) the amount of the person's independent income, (4) any informal custody arrangements for an unemancipated minor child, (5) the person's marital status, (6) the person's interim attendance at college, (7) the person's subjective intent, (8) the person's use of the parental home address on important personal documentation or for important personal reports or information (*e.g.,* tax returns, car registration, voting lists, or banking statements), (9) the person's decision to permit such documentation to lapse, (10) the person's receipt of mail at the parental home, (11) the person's retention of a bedroom in the parental home, (12) the person's storage of personal belongings in the parental home, (13) the nature of the person's continuing activities while in the parental home, (14) the frequency of the person's overnight visits to the parental home, (15) the person's need to bring other personal belongings to the parental home on overnight visits, (16) any special circumstances indicative of a motivation not to resume residence, such as the person's awareness of an outstanding arrest warrant. *See also Friedman v. Alliance Ins. Co.,* 240 Kan. 229, 729 P.2d 1160, 1166 (1986) (identifying similar factors and others, such as person's retention of house key, personal relationship with parents, and establishment of second residence).

a definitive ruling under the governing residency criteria. *See, e.g., Willis v. Allstate,* 88 Md.App. 21, 591 A.2d 896, 899 (1991) (summary judgment review) (citing *Carrera,* 577 A.2d 980, 985 (R.I.1990)) (quoting *Hamilton v. State Farm Mut. Auto. Ins. Co.,* 364 So.2d 215, 218 (La.App. 1979)) (other citations omitted); *see also Trezza v. State Farm Mut. Auto. Ins. Co.,* 519 So.2d 649, 650 (Fla.App.1988) (whether undisputed facts "fit within the policy definition is a question of law that may be decided on appellate review"). These decisions are expressly predicated on the recognized rule of contract construction that *unambiguous* language in an insurance policy is to be accorded its plain meaning, that the term "resident of the same household" is unambiguous, and that it is for the court, therefore, to decide whether, on balance, the competing circumstantial evidence not in dispute is sufficient to show that the individual in question was a "resident of the same household." *See Willis,* 591 A.2d at 900 (citing *Peninsula Ins. Co. v. Knight,* 254 Md. 461, 255 A.2d 55, 55 (1969)); *Trezza,* 519 So.2d at 650. Under these legal guidelines, the trial court, rather than the jury, would be required to weigh all the competing circumstantial evidence not in genuine dispute and enter summary judgment for one party or the other based on the applicable residency criteria.

The district court implicitly determined that Rhode Island law at least *permits* the submission of the residency issue to the jury in the face of competing circumstantial evidence which is not in dispute, but then determined that no reasonable jury could return a verdict in favor of Blanchard on the residency issue based on the evidence presented in the course of the summary judgment proceeding. We must make an independent determination as to the nature of the ultimate residency determination, and by whom it is to be made, under Rhode Island law. *See Salve Regina College v. Russell,* —— U.S. ——, 111 S.Ct. 1217, 113 L.Ed.2d 190 (1991).[4]

In *Carrera,* it appears that the Rhode Island Supreme Court expressly rejected the interpretive principle on which the *Willis* and *Trezza* decisions are premised, by observing that "the term 'domicile' has a

4. Due to the procedural posture in which the *Carrera* and *Barricelli* cases came before the Rhode Island Supreme Court, we cannot determine conclusively whether the "totality of the circumstances" analysis required in the present case yet remains a mixed question or has become a pure question of law. For one thing, *Carrera,* 577 A.2d 980, was *not* a summary judgment case. The *Carrera* Court observed that "the *court* must consider ... the totality of the circumstances...." *Id.* at 985. The "residency" test in *Carrera* is then stated without citation to caselaw from other jurisdictions and with no discussion as to whether it is necessary, or even permissible, to submit the issue of "residency" to the jury in cases where there is conflicting evidence on the issue, but the competing evidence is not in *dispute.* The Rhode Island Supreme Court simply upheld the findings made by the trial court, following a five-day *bench* trial, as "amply supported by the evidence." *See Roland M. v. Concord School Comm.,* 910 F.2d 983, 990 (1st Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 1122, 113 L.Ed.2d 230 (1991) (district court's resolution of mixed question of law and fact reviewed for clear error, and appellate court will defer to district court's reasoned application of applicable "legal standard to a particular set of facts," and to the district court's determination "whether certain facts possess, or lack, legal significance in a given case").

In *Barricelli,* 583 A.2d at 1271, on the other hand, an unemancipated child of divorced parents had lived most of the time with her father. Although the divorced parents had agreed that the father was to provide primary care, at the time of the child's death the mother retained formal legal custody under the divorce decree. The trial court granted summary judgment on the ground that the child was not a resident of the mother's household, notwithstanding undisputed evidence that the child still maintained some contacts with her mother's home. The Rhode Island Supreme Court affirmed, explaining that "not all *types* of contact with an insured's household make a person a 'resident.'" *Id.* at 1271 (emphasis added). The court held that the totality of the circumstances "evidence[d] the impermanence of [the child's] physical presence in her mother's household" and that the defendant was therefore entitled to judgment "*as a matter of law." Id.* at 1272 (emphasis added). The court did not state whether the "totality of the circumstances" determination on undisputed evidence invariably presents a question of law for the court in all cases, or whether the trial court's withdrawal of the "residency" issue from the jury had been proper only because the plaintiff had produced insufficient evidence to support a reasonable inference of "residency."

fixed legal meaning [, while t]he meaning of the term 'residence' ... must be derived in part *from the context in which it is used.*" *Carrera,* 577 A.2d at 983 (emphasis added). Since the meaning of "residence" under Rhode Island law apparently cannot be determined apart from the specific contractual context in which it is used,[5] the first task is to ascertain the intent of the contracting parties in employing the particular contract language and to determine whether the circumstances of the putative resident, as revealed by the evidence, bring that person within the "residency" definition contemplated by the parties to the contract.

The contracting parties' intent generally is deemed a material issue of fact precluding summary judgment, except in cases where "the supporting evidence is sufficiently one-sided" that "no 'reasonable person could differ.' " *See Boston Five Cents Sav. Bank v. Department of Hous. & Urban Dev.,* 768 F.2d 5, 8 (1st Cir.1985) ("an argument between parties about the meaning of a contract is typically an argument about a 'material fact' "); 3 Arthur Corbin, *Corbin on Contracts* § 554 (1960 & Supp.1991). More to the point, the "totality of the circumstances" test enunciated

in *Carrera* expressly requires at least two "reasonableness" evaluations (namely, "reasonably recent" presence and "reasonably foreseeable" return) normally entrusted to the jury. *Cf. Lariviere v. Dayton Safety Ladder Co.,* 525 A.2d 892, 898 (R.I. 1987) (in breach of warranty case, "reasonableness" of time lapse prior to notification of breach is question of fact for jury); *Majewski v. Porter,* 121 R.I. 757, 403 A.2d 248, 249–50 (1979) (in breach of contract case, "reasonableness" of time lapse between discovery of breach and exercise of right to rescind is question of fact for jury). We therefore conclude that the "residency" determination required under the existing "totality of the circumstances" test in Rhode Island remains a mixed question of law and fact which precludes summary judgment unless no reasonable trier of fact could draw any other inference from the "totality of the circumstances" revealed by the undisputed evidence.[6]

### B. *Subjective Intent as a Material Fact*

Aside from the ultimate residency determination itself, the subjective intent of Paul Brown at the time of the shooting incident in August 1987 was the *only* mate-

5. The Peerless policy, like the policies at issue in *Carrera* and *Barricelli,* defines the term "insured" to include the named insureds and "residents of [their] household," but the term "resident" is not further defined in any of the policies. *See also Cincinnati Ins. Co. v. Argubright,* 151 Ill.App.3d 324, 104 Ill.Dec. 371, 375, 502 N.E.2d 868, 872 (1986) (phrase "resident of household" has "no precise meaning in the law"). Where a contextual ambiguity exists, courts generally have concluded that the contract language "should be given the broadest construction and that all who may be included, by any *reasonable construction of such terms* ... should be given its protection." *Great American Ins. Co. v. Allstate Ins. Co.,* 338 S.E.2d 145, 147 (N.C.App.1986) (term " 'resident' ... flexible, elastic, slippery") (emphasis added); *see also Aetna Cas. & Sur. Co. v. Crafton,* 551 N.E.2d 893, 895 (Ind.App.1990) ("extension" of coverage cases warrant broad construction of term "resident," while "exclusion" cases warrant narrow interpretation).

6. The caselaw in other jurisdictions overwhelmingly favors the view that the "totality of the circumstances" calculus is for the jury. *See, e.g., Hardesty v. State Farm Mut. Auto. Ins. Co.,*

382 F.2d 564, 565 (10th Cir.1967) ("function of the court remains, then, to submit to the jury consideration of evidentiary facts from which different permissible inferences [of residency] may be drawn"); *Aetna Cas. & Sur. Co. v. Means,* 382 F.2d 26, 31 (10th Cir.1967) (same); *State Farm Mut. Auto. Ins. Co. v. Hollingsworth,* 759 F.Supp. 1355, 1361–62 (W.D.Ark.1991) (same); *Lewis v. Dairyland Ins. Co.,* 169 Ga.App. 265, 312 S.E.2d 165, 166 (1983) ("conflicting" circumstances create question of fact precluding summary judgment on issue of residency); *Wood v. Mutual Serv. Cas. Ins. Co.,* 415 N.W.2d 748, 750 (Minn.App.1987) ("Residency in a household is a question of fact"); *Hartford Ins. Group v. Winkler,* 89 Nev. 131, 508 P.2d 8, 11 (1973) (same); *Wilson v. State Farm Mut. Auto. Ins. Co.,* 92 N.C.App. 320, 374 S.E.2d 446 (1988), *rev'd. on other grounds,* 327 N.C. 419, 394 S.E.2d 807 (1990). *Cf. Zurich American Ins. Co. v. Bruce,* 193 Ga.App. 804, 388 S.E.2d 923, 924 (1989) (jury determines whether handicapped individual attending equestrian event was "participant" within meaning of insurance contract); *Nixon v. Life Investors Ins. Co.,* 675 S.W.2d 676, 678 (Mo.App.1984) (jury question whether "lung cancer" is within meaning of phrase "disease of lung" in insurance contract).

rial fact in genuine dispute. Blanchard's main contention on appeal is that the credibility and weight to be given the Browns' deposition testimony as to Paul Brown's subjective intent are trialworthy jury issues which precluded summary judgment. Blanchard argues, *inter alia*, that Paul Brown reasonably could be found to have been a "resident" of the Brown family household at the time of the shooting incident if the jury were to decide not to credit the Browns' countervailing deposition testimony.[7] Under Rhode Island law, evidence of a putative resident's state of mind may be "pertinent" to the determination of residency, although it need not constitute the "single dispositive factor." *Carrera,* 577 A.2d at 984 (citing *Flather,* 377 A.2d at 229); *see also A.G. v. Travelers Ins. Co.,* 112 Wis.2d 18, 331 N.W.2d 643, 645 (App. 1983) (declared intent of putative resident to be considered, but not controlling).[8]

■ The district court's explication of its grant of summary judgment indicates that it relied, to some degree at least, on Paul Brown's statements of subjective intent, as corroboration for its conclusion that the *objective* evidence generated no trialworthy "residency" issue for the jury. *See supra* p. 485. At the summary judgment stage, the nonmoving party is "entitled 'to have the credibility of *his* evidence as forecast

assumed, his version of all that is in [genuine] dispute accepted, [and] all internal conflicts in [the evidence] resolved favorably to him....'" *Rodriguez–Garcia v. Davila,* 904 F.2d 90, 94 (1st Cir.1990) (citing *Greeburg v. Puerto Rico Maritime Shipping Auth.,* 835 F.2d 932, 936 (1st Cir.1987) (citing *Charbonnages de France v. Smith,* 597 F.2d 406 (4th Cir.1979))) (emphasis added). Accordingly, the district court's apparent determination that the Browns' deposition testimony provided support for the entry of summary judgment against Blanchard would have been permissible only if Paul Brown's subjective intent was *not in dispute.* On the other hand, the district court's determination would have been impermissible if Blanchard presented evidence that Paul had expressed an intention to retain or resume residence in the Brown family household or if Blanchard demonstrated a genuine issue as to the *credibility* of Paul's deposition testimony to the effect that he never again intended to reside in the Brown family household.

Since the record did not contain any prior statement inconsistent with Paul's deposition testimony, Blanchard was not entitled to the summary judgment *presumption* that Paul harbored a subjective intention to retain or resume residence in the Brown

---

7. Blanchard correctly notes that neither *Carrera* nor *Barricelli* involved "state of mind" testimony directly probative of the subjective intentions of the putative "residents," both of whom had departed all earthly abodes and were unavailable to testify.

8. While we assume for present purposes, without deciding, that evidence of subjective intent is a *distinct* element and can be established independently without resort to *objective* manifestations of intent, the probative value of the putative resident's subjective statements is often problematic. The "intent" which ultimately controls the analogous determinations of "residence" and "domicile" turns primarily on the "*objective facts* [,and] 'statements of intent are entitled to little weight *when in conflict with facts.*'" *Freeman v. Northwest Acceptance Corp.,* 754 F.2d 553, 556 (5th Cir.1985) (quoting *Hendry v. Masonite Corp.,* 455 F.2d 955, 956 (5th Cir.), *cert. denied,* 409 U.S. 1023, 93 S.Ct. 464, 34 L.Ed.2d 315 (1972)) (emphasis added) (discussing proof of "domicile"). Since the parties may attempt to recast their past conduct to suit present interests, true intent to make a place one's "domicile" or "residence" can best be dis-

cerned, ultimately, through resort to the *entire* pattern of conduct preceding the incident which gave rise to the claim:

> As the real intention of a person seeking to establish the existence of a domicile is known only to him, any statements he makes, particularly as in the case at bar, are not controlling but *the truth of his assertions are to be determined by the court upon the consideration of all the evidence.* ... [M]ere affirmations of intent by a petitioner to make Rhode Island his domicile standing alone and *unevidenced by any objective manifestations of his professed intent were entitled to little or no weight.*

*Parker v. Parker,* 103 R.I. 435, 238 A.2d 57, 60 (1968) (not a summary judgment case) (citation omitted) (emphasis added) (not a summary judgment case). A putative resident's subsequent statements as to a preexisting state of mind are useful primarily to confirm a finding of "residency" or "nonresidency" predicated principally on the *objective* evidence. *See also supra* note 2.

family household. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257, 106 S.Ct. 2505, 2514–15, 91 L.Ed.2d 202 (1986) (even though "state of mind" is a material issue, nonmoving party cannot survive post-discovery summary judgment by mere denials, but must set forth facts from which factfinder might draw contrary inference).[9]

The only *direct* evidence of subjective intent on the issue of residence are the statements of the putative resident. Although the mere fact that the putative resident's "state of mind" is relevant to the "residency" determination does not preclude summary judgment, a number of courts, including our own, have been reluctant to permit summary judgment where the nonmoving party *demonstrates a genuine dispute as to the credibility* of the witness whose subjective intent is at issue, particularly where cross-examination offers the only realistic prospect for resolving the credibility concern. *See, e.g., Stepanischen v. Merchants Despatch Transp. Corp.*, 722 F.2d 922, 928–29 (1st Cir.1983); *Maiorana*, 596 F.2d at 1076–77; *see also International Shortstop, Inc. v. Rally's Inc.*, 939 F.2d 1257, 1266 (5th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 936, 117 L.Ed.2d 807 (1992); *White v. Roper*, 901 F.2d 1501, 1505 (9th Cir.1990); *Ness v. Marshall*, 660 F.2d 517, 519 (3d Cir.1981).

"State of mind" testimony from the putative "covered person" may raise inherent credibility concerns insofar as it supports limitations on third-party beneficiary coverage in the somewhat unusual circumstances where the financial interests of an insurer and its insured are aligned. Blanchard specifically points to undisputed evidence from which a jury might reasonably infer that Paul's statements as to his subjective intent were motivated by self-interest.[10] Were a jury to credit Blanchard's evidence, it would be entitled to infer that Paul did not harbor the intent to which he testified on deposition. Under the well-recognized summary judgment procedure controlling our de novo review, *see Siegal,* 921 F.2d at 17, we are required to view all evidence, and fair inferences therefrom, in the light most favorable to Blanchard.

We must conclude, therefore, that even though it may have been impermissible to infer, for summary judgment purposes, that Paul subjectively intended to return to live with his parents, *see Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 512, 104 S.Ct. 1949, 1965–66, 80 L.Ed.2d 502 (1984) (while jury may discredit testimony based on credibility determination, "discredited testimony is [normally] not considered a *sufficient* basis for drawing a contrary conclusion") (emphasis added), Blanchard nevertheless demonstrated a

---

**9.** Of course, if Paul's subjective intent were a *dispositive* element essential to Blanchard's claim, Peerless would have been entitled to summary judgment as a matter of law. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986) ("failure of proof concerning an essential element ... renders all other facts immaterial"). However, since Blanchard might still prevail under the "totality of the circumstances" test, even without direct evidence of Paul's subjective intent, his opposition to the motion for summary judgment would be strengthened if he were able to *deprive* Peerless of the use of Paul's statements of intent as undisputed evidence at the summary judgment stage.

**10.** Blanchard adverts to evidence from which it could be inferred that Paul was determined to protect his parents from an increase in their homeowners premiums resulting from any adverse judgment against Peerless. Paul admitted that he had conferred with several lawyers and

with an insurance adjustor, between August 1987 and the date of his deposition testimony, and that the insurance adjustor asked him for the names and addresses of Paul's girlfriend and the friend from whom Paul was renting a room in 1987. In addition, it might be inferred that Paul engaged in certain *post*-incident conduct in order to corroborate his stated intention not to return to live with his parents, most significantly his decision to move from his "temporary" rented room to his "permanent" residence with his girlfriend three weeks after Blanchard's injuries. Blanchard produced evidence that, within a few months after Paul made this move, his living arrangement with his girlfriend had already become spasmodic. There is also evidence that Paul opened a bank account *after* the shooting incident and again used his parents' address. While *post*-incident conduct may not be directly probative of "residency" under *Carrera,* evidence of inconsistent conduct by the putative resident may raise genuine credibility concerns. *See supra* note 2 & accompanying text.

sufficient evidentiary foundation on which a jury would have been entitled to refuse to credit Paul's statements of intent. Therefore, Paul's deposition testimony as to his subjective intent is entitled to no weight in our *de novo* review of the grant of summary judgment against Blanchard.

## C. *"Totality of Circumstances" Test*

Blanchard further contends that Paul Brown's undisputed contacts with the family household, viewed in the neutral context of Paul's presumptively discredited deposition testimony, precluded summary judgment on the "residency" issue. Blanchard insists that the ultimate "residency" determination under Rhode Island's "totality of the circumstances" test remains a trialworthy issue even though no *particular* circumstantial evidence remains in genuine dispute, because a jury reasonably could conclude that either party was entitled to judgment based on the undisputed, competing evidence. We agree.

Blanchard's contention merely restates the basic summary judgment procedure applicable in the present case. Once all material facts in genuine dispute have been evaluated in the light most favorable to the nonmoving party, together with all supportive evidence not in dispute, as well as all reasonable inferences therefrom, summary judgment may nonetheless be appropriate if the nonmoving party is unable to demonstrate, through competent evidence, *see* Fed.R.Civ.P. 56(a), that each essential element of his claim or defense is *at least* trialworthy. *Siegal,* 921 F.2d at 17 (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2510–11, 91

L.Ed.2d 202 (1986)) (citations omitted); *Davila,* 904 F.2d at 94–95 (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986)); *Brennan v. Hendrigan,* 888 F.2d 189, 191 (1st Cir.1989) (concise articulation of summary judgment procedure). We therefore examine whether, viewing the *un* disputed, but competing, evidence in the light most favorable to Blanchard, *see Rodriguez–Garcia,* 904 F.2d at 94 (nonmoving party entitled to have "all internal conflicts in [the evidence] resolved favorably to him"), a jury reasonably could have returned a verdict for Blanchard on the "residency" issue.[11]

### 1. Objective Manifestations of "Nonresidency"

The district court concluded that Peerless had presented objective evidence which "overwhelmingly supported" a finding of "nonresidency." Although it is not entirely clear precisely what weight the district court attributed to it, we again emphasize that Paul's deposition testimony as to his subjective intent was not entitled to be credited in favor of either party for summary judgment purposes. Likewise, Paul's *post*-incident actions, particularly the decision to move from his rented room into his girlfriend's apartment three weeks after the incident, would be entitled to *no weight* for summary judgment purposes since a jury might reasonably refuse to credit Paul's *post*-incident conduct. *See supra* note 2.

Second, the undisputed evidence that Paul left the family household, following a "disagreement" with his parents over cur-

---

**11.** Although we examine primarily the material factors discussed in the two extant Rhode Island decisions, we reemphasize the commonality of factors considered material to the "residency" determinations made by courts in other jurisdictions. *See, e.g., supra* note 3. *Carrera* upheld a trial court finding that an adult son was not resident at his mother's Rhode Island home at the time of his fatal automobile accident in Florida, where the son had moved to his girlfriend's apartment eleven months before the accident, later lived on the streets and in a drug rehabilitation center, violated probation by travelling to Florida for employment, and became aware of an outstanding warrant for his arrest in Rhode Island. *Carrera,* 577 A.2d at 982. The *undisputed* facts in *Barricelli* established that the unemancipated minor daughter of divorced parents lived on a "permanent" basis with her father, but slept at her mother's house every other weekend and kept a few personal belongings at the mother's house. Although the child remained in the formal legal custody of the mother under the terms of the divorce decree, the parents informally modified the decree by agreeing that the child would move from the mother's home to live permanently with the father. *Barricelli,* 583 A.2d at 1271.

few rules, permitted, *but did not require,* an inference that he thereupon permanently abandoned any residence in the Brown family household. There was no testimony that any permanent rift resulted from, or any antagonism lingered after, the family disagreement, such as might preclude an inference, based on Paul's later *pre*-incident conduct and contacts with the family home, that he retained or resumed his residence in the family home. Nor was there evidence of special circumstances indicating that retention or resumption of residence in the family home would risk significant detriment. *Cf., e.g., Carrera,* 577 A.2d at 985 (putative resident's awareness *of* outstanding arrest warrant was single most persuasive evidence of intention not to return to mother's Rhode Island home). Indeed, Paul's frequent and regular return visits—*for* meals, to do family chores, to use and retrieve personal belongings— could be considered evidence that no serious rift resulted.

Finally, Rhode Island law specifically provides that a person may maintain *simultaneous* residences. *See id.* at 983 ("person may have two places of residence … but only one domicile"). Indeed, where an insurance contract contains the ambiguous term "resident," the *Carrera* decision acknowledges the general principle "favoring broad coverage," *id.,* and recognizes the appropriateness of alternative "residency" tests, *see supra* pp. 485–486.

Under the *"actual* residency" test, if a significant physical presence was being maintained in the family household at the time of the incident, the factfinder must ascertain whether the surrounding circumstances indicate an intent to depart the household within a brief period, or an intent to maintain the current presence for an indefinite or extended period. *See Carrera,* 577 A.2d at 985. Alternatively, under the *"constructive* residency" test, if no significant physical presence is being maintained in the household at the time of the incident but a continuous presence was maintained in the recent past, the factfinder must scrutinize all "manifestations" indicating an intent to resume residence in the family household. *Id.; see also Hawai-*

*ian Ins. & Guar. Co.,* 534 P.2d at 51. Thus, standing alone, the decision to move into a rented room would not establish, as a matter of Rhode Island law, that Paul did not retain a "constructive residence" in the Brown family household. *See, e.g., Firemen's Ins. Co. v. Viktora,* 318 N.W.2d 704, 707 (Minn.1982) (son's maintenance of separate apartment does not preclude residence in the parental household where he attends meals and helps with chores).

### 2. Objective Manifestations of "Residency"

The district court concluded that there were *no* objective facts supporting a finding of "residency." The court rejected Blanchard's contention that at least three of Paul's "contacts" with the family household at the time of the shooting incident contravened Paul's deposition testimony that he did not intend to retain or resume residence in the family household. We think these three "contacts" were mistakenly mischaracterized as legally insignificant.

First, the court noted that nonresident children routinely store their clothing and personal belongings after moving out of the family home, even though they may have no intention of retaining or resuming residence there. In the present case, however, Blanchard not only produced evidence that Paul continued to keep a lot of personal belongings in his old bedroom in the family home, *cf. Barricelli,* 583 A.2d at 1271 (daughter kept "a *few* personal belongings"), but that Paul continued to make *use* of some of these belongings (*e.g.,* skis, guns) during the period between November 1986 and August 1987. Indeed, the pellet gun with which Blanchard was injured had been retrieved that very day from Paul's old bedroom in the family home. We cannot conclude that a jury reasonably could not have inferred that Paul's characterization of what he did—as an entirely passive *storage* of belongings in the family home—substantially understated its true purport. *See, e.g., Federated American Ins. Co. v. Childers,* 45 Or.App. 379, 608 P.2d 584, 586–87 (1980) (student

"resident" of father's home where he kept personal belongings).

Second, the district court observed that parents and nonresident children commonly retain keys to their respective residences. While it is no doubt true that nonresident children often retain keys for emergency or occasional access to the parental home, Blanchard produced evidence from which it could be inferred that Paul retained a key to the family home, with the full knowledge of his parents, for the purpose of enjoying *routine and unfettered access* to the family household. For example, on the day of the shooting incident Paul's parents were not at home, but Paul was there to watch movies with his girlfriend. *Cf., e.g., Mutual Serv. Cas. Ins. Co. v. Olson*, 402 N.W.2d 621, 624 (Minn.App.1987) (minor son "resident" of parental household to which he retained key).

Finally, the district court noted that Paul never *directed* the Postal Service to continue to deliver his mail to the family home address after the shooting incident; he simply did not direct the Postal Service to deliver it to any other address, so certain mailings continued to be delivered to the family home.[12] Yet another, and no less reasonable, inference which might be drawn from Paul's *inaction* would be that he continued to regard the Brown family household as his primary residence after moving into the rented room in November 1986. *See, e.g., Clark v. Harris*, 522 So.2d 673, 676 (La.App.1988) (one material factor supporting "residency" is continued receipt of mail or messages); *Argubright*, 104 Ill. Dec. at 375, 502 N.E.2d at 872 (same); *Grinnell Mut. Reinsurance Co. v. Scott*, 628 S.W.2d 355, 356–57 (Mo.App.1981) (same). Under Rhode Island law, a putative resident's "inaction" is considered competent evidence for purposes of the "residency" determination. *See Carrera*, 577 A.2d at 982 (putative resident's inaction in allowing Rhode Island license and registration to lapse, considered competent evi-

dence of intent to abandon residence at address appearing on documents).

The district court discounted direct deposition testimony to the effect that Paul retained his parents' address on important personal documentation (driver's license, registration, tax return) and that he opened a bank account *after the August 1987 shooting incident*, using his parents' home address as his mailing address. *See, e.g., Lewis v. Dairyland Ins. Co.*, 169 Ga.App. 265, 312 S.E.2d 165, 166 (1983) (even though adult son had expressed no intention to reside with father and stored no personal belongings at father's residence, use of father's address on son's college application precluded summary judgment for father's insurance company); *Dobson v. Maki*, 184 Mich.App. 244, 457 N.W.2d 132, 135 (1990) (use of mailing address on important documentation constitutes *dispositive* proof of "domicile in same household" under insurance policy); *State Farm Fire & Cas. Co. v. Short*, 448 N.W.2d 560, 564 (Minn.App.1989) (son "resident" at parental home address used on son driver's license, vehicle registration, and voter list); *cf. Carrera*, 577 A.2d at 982 ("nonresident" child used *new* Florida address on employment application). Where its competence and materiality are clear, the nonmovant's evidence may not be discounted at the summary judgment stage.

The district court did not discuss other material evidence from which a jury might reasonably infer that Paul retained a residence at the family home throughout the period preceding the shooting incident. Apparently, Paul's rental of a room from a friend was Paul's *first* such parting from the family household, *cf. Carrera*, 577 A.2d at 982 (nonresident son moved out of mother's home, first to girlfriend's apartment, then lived on the streets, and then in a drug rehabilitation center, all prior to leaving state), and, by his mother's own account, it was an experimental "phase in-phase out" period characterized by frequent and regular visits. *Cf. Barricelli*,

---

**12.** Paul explained on deposition that he deferred filing a change of address form because he considered his rented room a "temporary" transitional arrangement prior to moving into an apartment with his girlfriend. The credibility of this testimony appears open to question in light of Paul's *post*-incident use of the parental home address to establish a new bank account.

494

583 A.2d at 1272 (child's irregular or sporadic visitation may support "nonresidency"); *Crafton,* 551 N.E.2d at 895–96 (same).

Although Paul was no longer a minor in August 1987, he was not of such advanced age that his renting of a room from a friend would foreclose an inference that he intended to retain or resume his longstanding residence in the family household.[13] Rather, such initial and often tentative separations from the parental home are most analogous to the partings that take place when adult children go away to college for the first time, or enter military service, in the sense that the adult child's plans typically remain unclear. Thus, in the vast majority of such cases, the adult child is *presumed* to retain a residence in the family home. *See, e.g., Donegal Mut. Ins. Co. v. McConnell,* 562 So.2d 201, 204 (Ala.1990) (serviceman-son remained "resident" of parent's household); *Montgomery v. Hawkeye Security Ins. Co.,* 52 Mich.App. 457, 217 N.W.2d 449, 451 (1974) (emancipated child "resident" in family home during absence at school); *Childers,* 608 P.2d at 586–87 (son away at school remained "resident" of father's household). Nor was there evidence that Paul had immediate plans to marry or to start his own family. *Cf. Argubright,* 502 N.E.2d at 873 (intention to marry may suggest nonresidency with parents).

Moreover, Blanchard produced evidence from which it might reasonably be inferred that Paul was not yet financially independent from his parents. For instance, Paul conceded that he was employed only intermittently during 1987, had not earned enough income in 1987 to require the filing of a tax return, did family chores at the Brown home once a week, and attended meals there no less than once a week. *Compare Wood v. Mutual Serv. Cas. Ins. Co.,* 415 N.W.2d 748, 750–51 (Minn.App. 1987) (son remained "resident" of parental home while still financially dependent on parents) *with French v. State Farm Mut. Auto. Ins. Co.,* 372 N.W.2d 839, 843 (Minn.

App.1985) (son who received no financial assistance from parents and was self-supporting, not "resident" in family home).

In sum, although the result reached by the district court is an eminently reasonable one, our *de novo* review of the entire record in light of the controlling substantive law satisfies us that summary judgment for either party would entail impermissible factfinding. The summary judgment must be vacated, and the case remanded for trial.

*The district court judgment is vacated and the case is remanded for further proceedings consistent with this opinion.*

---

13. The age of majority in Rhode Island is eighteen years. *See* R.I.Gen.Laws § 15–12–1 (1988).

Paul was twenty years old at the time of the shooting incident.